UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BRUCE JOHNSON,                    )
                                  )
          Plaintiff,              )
                                  )
     vs.                          )        No. 4:06-CV-1805 (CEJ)
                                  )
MIDCOAST AVIATION,                )
                                  )
          Defendant.              )

**MEMORANDUM AND ORDER**

This matter is before the Court on defendant Midcoast Aviation's motion for summary judgment. Plaintiff Bruce Johnson opposes the motion, and the issues have been fully briefed.

Plaintiff's amended complaint asserts claims based on Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended, and the Civil Rights Act of 1991, 42 U.S.C. § 1981 et seq. Plaintiff contends that defendant allowed or created a hostile working environment, failed to accommodate plaintiff's religious beliefs, and wrongfully terminated plaintiff's employment because of his religious beliefs. Plaintiff seeks an award of damages for past and future pecuniary loss and for physical and emotional pain and suffering. Plaintiff also seeks punitive damages pursuant to § 1977A of the Civil Rights Act of 1991, 42 U.S.C. § 1981(a).

I. **Background**

Defendant Midcoast Aviation operates an aircraft maintenance and repair facility at the St. Louis Downtown Airport. In October 2004, plaintiff applied for position in the defendant's training and development department. He was interviewed on October 19, 2004 by three people, including Kevin Dawson, who then the defendant's director of human resources. While plaintiff was not asked about

his religious views during the interview, he volunteered this information to Mr. Dawson either during the interview or shortly thereafter. Plaintiff explains his religious views as follows:

My Christian values are beliefs that I hold and beliefs that I use to guide me. I, as a Christian, believe in the teachings of Jesus, that Jesus was the son of God and that Jesus taught all humans have value...As a Christian, I also believe that the teachings of the Episcopalian church are important to me and that for my spiritual development I should participate in religious ceremonies or occasions. (Plaintiff Dep. at 34).

Plaintiff was offered a position as Manager for Training and Development on October 28, 2004. Plaintiff began work in that capacity on November 15, 2004. His duties included providing training classes for Midcoast employees. The decision to hire plaintiff was made by Mr. Dawson, who became plaintiff's direct supervisor.

According to e-mail records, Mr. Dawson attended a meeting on January 5, 2005 with upper management regarding Midcoast's training and development. Mr. Dawson asked plaintiff to continue his preparations for the first training course and informed him that he would be receiving additional materials to incorporate into the course. On January 17, 2005, Mr. Dawson sent plaintiff the material to include in the training class. Almost immediately after receiving the materials, plaintiff sent an e-mail to Mr. Dawson explaining that he did not feel that the material fit into his training class. Plaintiff believed that the materials touched on customer service issues while his class focused on the communication process. He informed Mr. Dawson that he might not include these materials. In a short e-mail reply, Mr. Dawson told plaintiff that "[t]his material will be in [the] training class,

period." Plaintiff subsequently incorporated the material and conducted the training class.

Plaintiff and Mr. Dawson were scheduled to attend a conference presented by the American Society of Training and Development (ASTD) in Las Vegas from February 2 through February 4, 2005. Plaintiff and Mr. Dawson had reservations for the Folies Bergere, a Las Vegas show that featured topless female dancers. On January 21, 2005, plaintiff sent Mr. Dawson an e-mail, stating:

> I want to talk to you about the show that we have a
> reservation for, during our trip to Las Vegas. I have
> mentioned to you that I have strong Christian values
> before. I have been thinking about this show and I do not
> feel comfortable going to it and I am respectfully going
> to decline going to this show. When I call to change the
> reservation, would you like for me to leave your name on
> it?

Mr. Dawson responded by e-mail, telling plaintiff to "[p]lease remove my name."

Shortly before the trip, plaintiff was informed that another employee, Cori Ferguson, would be attending the conference with plaintiff instead of Mr. Dawson.[1] On February 2, 2005, while at the conference, plaintiff sent an e-mail to Mr. Dawson stating that he was "having a wonderful time here at this ASTD conference." Plaintiff told Mr. Dawson that he was "gaining a lot of great information and knowledge that I can use to help create education programs for Midcoast." Plaintiff then wrote:

---

[1]The reason for the change is disputed. Mr. Dawson claims that work commitments required him to forego the conference while plaintiff insists that Mr. Dawson's change of heart occurred as a result of plaintiff's refusal to attend the Folies Bergere show. Nevertheless, plaintiff admits that he was not required to attend the Folies Bergere show, nor any other show while in Las Vegas.

If I could, I would like to speak with sincerity for a minute, and share with you some insight I gained today – insight that may explain why a conflict came up:

A. When I came to Midcoast, when I came to work for you, and when I came to the senior management team, this was my perspective: Human Performance Improvement Soft Skills Development Knowledge Work

B. When I met with the senior management team, their focus or thoughts about training were the problems on the floor and telling employees what to say and how to behave.

Here is where the conflice[2] (sic) arose: I was thinking in terms of teaching for performance improvement, training for skill set development. The senior management team was thinking in terms of telling employees to create change.

Plaintiff sent Mr. Dawson a second e-mail from the conference on February 2, 2005, again expressing his gratitude for being able to attend the conference. He told Mr. Dawson that he was "also enjoying this time with Cori".

On February 3, 2005, while at the conference, plaintiff sent an e-mail to a friend telling her that his last class was "awesome" and that he was "on fire". Plaintiff told his friend that he was going to build his own training model and hopefully write a book. He closed his e-mail as follows: "And trust me, if Midcoast doesn't want my talent, bye bye bye!!!!"

Plaintiff returned to work following the conference on February 7, 2005. Plaintiff claims that no one talked to him upon his return, and he believed this was because Mr. Dawson told everyone

---

[2]In his deposition, plaintiff denies that there was a conflict between him and management regarding different training philosophies, although he admits typing the e-mail describing the conflict. He insists that when he typed "conflice" he meant concern and not conflict. (Plaintiff Depo. at 132-35).

-4-

that plaintiff was a "problem employee".[3]  Plaintiff acknowledges that Mr. Dawson came into his office to tell plaintiff that he hoped plaintiff brought back some good information from the conference.   Plaintiff contends that Mr. Dawson would only communicate to him via e-mail from that point on.

E-mail records show that in the initial days following his return from the conference, plaintiff spent a substantial amount of time e-mailing friends and family members.  Records show over one hundred personal e-mails to and from plaintiff's work e-mail account from 8:23 a.m. to 4:48 p.m. on February 7, 2005, plaintiff's first work day after the conference.[4]  Again on February 8, 2005, over one hundred (mostly personal) e-mails were sent and received from 8:04 a.m to 4:12 p.m. on plaintiff's work e-mail account.  Some of these e-mails were in response to job postings for which plaintiff submitted his resume.

In one of the e-mails sent on February 7, 2005, plaintiff told his friend that it "[s]eems lately that I have a cloud over me. The thrashings at work continue....All because I want to approach training as teaching and dared to ask a question."

_____

[3]Indeed, plaintiff alleges that Mr. Dawson told plaintiff before the conference that he was "pissed" that plaintiff would not attend the Folies Bergere show and would tell everyone at the office that plaintiff was a "problem employee".

[4]Defendant contends that the quantity and content of these e-mails constituted abuse of its computer systems and violated the Internet and e-mail agreement signed by plaintiff.  Defendant points to several of the e-mails which comment on the appearances of co-workers and describe sexual conduct and/or sexual aspirations of plaintiff or his friends.  In his deposition testimony, plaintiff insists that each of these personal e-mails were sent either at lunch or during a personal break, even though it is undisputed that the personal e-mails were sent and received regularly throughout the entire work day.

Plaintiff attended the Ash Wednesday morning service at his church on February 9, 2005.  As he explained to his mother in an e-mail, as part of his religious activities for Ash Wednesday, plaintiff had ashes marked on his forehead.  Plaintiff alleges that upon his return to the office, Mr. Dawson verbally assaulted him.  Plaintiff testified that this was one of at least two occasions where Mr. Dawson used profanity towards him.   As plaintiff explained it in his deposition testimony:

> I had just arrived at the office from service that morning.
> Kevin saw me come in with the ashes on my forehead,
> followed me into my office and said, wipe those f---ing
> ashes off your forehead, and to use soap and water.

In an e-mail to his mother that morning, plaintiff indicated that he was ten minutes late to work, but that it had not mattered because Mr. Dawson was "somewhere else."   Although he had frequently discussed details of his work environment with his mother, plaintiff did not mention any confrontation with Mr. Dawson in the e-mail.

On February 11, 2005, in an e-mail sent to plaintiff, Mr. Dawson stated that the Training Advisory Board had an excellent meeting and asked plaintiff to prepare a needs analysis for the following week's meeting.  On February 14, 2005, Mr. Dawson sent plaintiff an e-mail requesting that plaintiff release training rooms that plaintiff had booked and again asked plaintiff to focus on a model for a "needs analysis".

Plaintiff was discharged from his employment with defendant on or about February 28, 2005.  The decision to terminate plaintiff's employment was made by Mr. Dawson.  According to plaintiff, he was called into Mr. Dawson's office and, in front of another employee,

was told by Mr. Dawson that his "job was over with". Plaintiff did not ask Mr. Dawson why he was being fired, but received a Service Letter in April 2005 indicating that "the character of [his] services was unsatisfactory." The letter indicated that plaintiff was not cooperative and was unreceptive to the suggestions of management regarding the materials to be included in plaintiff's training classes.

On June 8, 2005, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC), stating the following:

> On January 21, 2005, I informed my supervisor, Kevin Dawson, I would not attend a topless show while at a professional convention in Las Vegas, based upon my Christian values. On February 28, 2005, I was terminated.

Plaintiff filed this suit on December 20, 2006 against both Midcoast Aviation and Kevin Dawson. On March 15, 2007, plaintiff filed an amended complaint against only Midcoast Aviation. Defendant Midcoast filed the instant motion for summary judgment on February 15, 2008. Plaintiff opposes the motion.[5] Defendant received leave of Court to subsequently file a supplemental memorandum on the sole issue of damages, based on the after-

---

[5]Plaintiff submitted a memorandum in opposition to the motion for summary judgment, but failed to file a statement of material facts as required by E.D.Mo. L.R. 4.01(E). Instead, plaintiff simply denied or admitted, without reference to the record, each of defendant's statements of fact. After briefing on the motion for summary judgment was fully complete, plaintiff filed a motion asking for leave of Court to "amend" his statement of material facts, apparently unaware that he never submitted one to begin with. Defendant opposes plaintiff's request to add a statement of material facts at this juncture. Although plaintiff's attempt to file a statement of material facts came very late in the process, the Court has considered plaintiff's "amended" statement of facts in analyzing this motion.

acquired evidence doctrine. Plaintiff opposes defendant's supplemental argument as well.

**II.** **Legal Standard**

Rule 56(c)of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In ruling on a motion for summary judgment the court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. <u>Agristor Leasing v. Farrow</u>, 826 F.2d 732, 734 (8th Cir. 1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986); <u>Matsushita Electric Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-587 (1986); Fed. R. Civ. P. 56©. Once the moving party has met its burden, the non-moving party may not rest on the allegations of his pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e). Rule 56© "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear

-8-

the burden of proof at trial." <u>Celotex Corporation v. Citrate</u>, 477
U.S. 317, 322 (1986).

### III. <u>Discussion</u>

Defendant claims that summary judgment is appropriate on each
of plaintiff's claims in their entirety. In the alternative,
defendant contends that, even if the Court does not grant full
summary judgment, summary judgment on the issue of damages is
appropriate because defendant Midcoast would have terminated
plaintiff's employment when it discovered plaintiff's violation of
defendant's Internet usage policy. Thus, defendant alleges, under
the after-acquired evidence doctrine, plaintiff's potential
recovery is limited to back pay from February 28, 2005, the date of
plaintiff's termination, to June 16, 2005, the date defendant
discovered plaintiff's alleged violation of the Internet policy.

### A. <u>Hostile Work Environment</u>

Defendant contends that summary judgment is appropriate on
plaintiff's hostile environment claim for two reasons. First,
defendant asserts that, by failing to include any allegation of a
hostile environment in the administrative charge filed with the
EEOC, plaintiff has not fully exhausted his administrative remedies
with respect to such a claim. Second, defendant contends that
plaintiff has failed to establish a *prima facie* case of hostile
work environment. Because the Court agrees that plaintiff has
failed to establish a *prima facie* case for a hostile work
environment claim, the Court need not decide whether plaintiff
fully exhausted his administrative remedies.

"To establish a work environment claim, [plaintiff] must show: 1) [he] is a member of a protected group; 2) [he] was subject to unwelcome harassment; 3) the harassment was based on [his] protected status; and 4) the harassment affected a term, condition, or privilege of [his] employment." Devin v. Schwan's Home Service, Inc., 491 F.3d 778, 788 (8th Cir. 2007). "The harassment must be both subjectively offensive to the employee and objectively offensive such that a reasonable person would consider it to be hostile or abusive." Turner v. Gonzales, 421 F.3d 688, 695 (8th Cir. 2005). "Allegations of a few isolated or sporadic incidents will not suffice; rather, the plaintiff must demonstrate the alleged harassment was 'so intimidating, offensive, or hostile that it poisoned the work environment.'" Nitsche v. CEO of Osage Valley Elec. Coop., 446 F.3d 841, 846 (8th Cir. 2006)(quoting Tuggle v. Mangan, 348 F.3d 714, 720 (8th Cir. 2003)).

In support of his hostile work environment claim, plaintiff contends that Mr. Dawson was visibly upset when plaintiff refused to attend the topless entertainment show. According to plaintiff, Mr. Dawson yelled that he was "f---ing pissed off" at plaintiff. Plaintiff alleges that, from that point forward, Mr. Dawson refused to meet face-to-face with plaintiff and would only communicate with plaintiff by e-mail. Further, plaintiff notes that Mr. Dawson subsequently decided to not attend the conference with plaintiff. Plaintiff also alleges that Mr. Dawson told plaintiff that he was going to tell the entire office that plaintiff was a "problem employee". Additionally, Plaintiff contends that Mr. Dawson yelled at him and instructed him to "wipe those f---ing ashes off [his]

forehead" when plaintiff came to work after attending church on Ash Wednesday.

The Court concludes that these allegations, even if true, do not rise to the level necessary to support a hostile work environment claim. First, Mr. Dawson's use of profanity on two occasions, while perhaps unpleasant or rude, clearly falls below the threshold of actionable harm under Title VII. See Scusa v. Nestle U.S.A. Co., Inc., 181 F.3d 958, 967 (8th Cir. 1999)(isolated derogatory comments made to employee not sufficient to establish hostile working environment). Indeed, "Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace." Id. Likewise, Mr. Dawson's refusal to communicate with plaintiff except via e-mail and his decision to not attend the conference with plaintiff is not conduct "so severe or pervasive that it created an abusive working environment." Palesch v. Missouri Com'n on Human Rights, 233 F.3d 560, 566 (8th Cir. 2000). In fact, the undisputed evidence shows that plaintiff greatly enjoyed his time at the conference, even without Mr. Dawson's attendance.

Plaintiff also claims that, while plaintiff was attending the conference, Mr. Dawson told the other employees that plaintiff was a "problem employee" and instructed them to avoid plaintiff upon his return. This allegation is denied by one of plaintiff's former co-workers, who testified that he was not told by Mr. Dawson to avoid or ignore plaintiff. Indeed, plaintiff has presented no evidence that Mr. Dawson actually did say anything to any other employees. Plaintiff can have no personal knowledge in this regard

because he was in Las Vegas at the time he alleges the statements were made by Mr. Dawson. Plaintiff cannot rely upon his unsupported belief that Mr. Dawson did actually say anything derogatory regarding plaintiff to other employees. See <u>Davis v. City of St. John</u>, 2005 WL 6124835 at *2 (E.D. Mo. 2005)(noting that statements of opinion, belief, or hearsay must be disregarded in summary judgment analysis).

Finally, plaintiff contends that he was forced to remove ashes from his forehead while at work on Ash Wednesday. Plaintiff testified in his deposition that Mr. Dawson met him as he arrived at work following the early morning church service. Plaintiff claims that Mr. Dawson yelled at him in front of other employees and instructed him to clean off the ashes from his forehead. The Court notes that plaintiff's allegations in this regard are directly contradicted by plaintiff's own e-mail sent to his mother on Ash Wednesday morning, where he indicated that he arrived at work ten minutes late and did not see Mr. Dawson upon his arrival. However, even assuming that the alleged incident did indeed occur, the Court is not persuaded that this isolated incident constitutes harassment so severe or extreme so as to clear the "high threshold of actionable harm" required to raise a hostile environment claim. See <u>Duncan v. General Motors Corp.</u>, 300 F.3d 928 (8th Cir. 2002)(noting that plaintiff must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult).

None of plaintiff's allegations, taken separately or in the aggregate, rise to the level of harassment necessary to state an actionable work environment claim. Summary judgment in favor of

defendant on plaintiff's hostile work environment claim is appropriate.

**B.**   **Failure to Accommodate**

Plaintiff claims that defendant failed to accommodate plaintiff's religious beliefs by requiring him, as part of his employment, to attend a topless show and preventing him from wearing ceremonial ashes on his forehead in observance of Ash Wednesday.

"An employer is required to 'reasonably accommodate' the religious beliefs or practices of their employees unless doing so would cause the employer undue hardship." Wilson v. U.S. West Communications, 58 F.3d 1337, 1340 (8th Cir. 1995)(citing 42 U.S.C. § 3000e(j)). To raise an accommodation claim, an employee must show that: (1) he possesses a bona fide religious belief that conflicts with an employment requirement; (2) his employer was informed of this belief; and (3) he was disciplined for failing to comply with the conflicting requirement. Id. Once the employee establishes these elements, the burden shifts to the employer to show "that it is unable to reasonably accommodate the employee's beliefs without incurring undue hardship." Vetter v. Farmland Industries, Inc., 884 F.Supp. 1287, 1310 (N.D. Iowa 1995).

Defendant contends that plaintiff cannot establish that he possessed a sincerely held religious belief. Defendant claims that plaintiff acted in ways inconsistent with his alleged religious beliefs. Further, defendant argues that wearing ashes throughout the day on Ash Wednesday is not a requirement of plaintiff's religion.

The Court finds that plaintiff has, at the very least, created a genuine issue of material fact regarding the sincerity of his religious beliefs. Plaintiff's e-mails show that plaintiff discussed his religious faith with others on a regular basis. Plaintiff informed Mr. Dawson during his initial interview or shortly thereafter that he possessed deep religious beliefs.

The Court is not convinced by defendant's contention that plaintiff's conduct is necessarily contrary to his religious views. Even if this were so, it does not require a finding that plaintiff does not possess those religious views. As plaintiff states, the law does not require him to be a perfect Christian. Plaintiff has presented sufficient evidence to create an issue of fact regarding the sincerity of his religious beliefs.

However, plaintiff must show not only that he possessed religious beliefs, but must also establish that those beliefs conflicted with a requirement of his employment. Plaintiff claims that his employment required him to attend a show featuring topless female dancers and required him to forego his observance of Ash Wednesday by forcing him to remove ashes from his forehead while at work.

In the Court's view, plaintiff has not presented sufficient evidence to support his claim that attending the topless show was a requirement of his employment. There is no evidence that plaintiff's duties, as the Manager of Training and Development, required his attendance at the show.[6] Plaintiff was able to

_____

[6]Indeed, plaintiff testified that he was not required to even attend the conference in Las Vegas, but that he went voluntarily.

-14-

withdraw his reservation after he expressed concern about the show. Plaintiff attended the conference without being required to attend the Folies Bergere show and enjoyed his time in Las Vegas. Plaintiff's religious belief that he should not attend a topless entertainment show did not conflict with his employment duties at Midcoast.

However, plaintiff's religious belief that he should wear ashes on his forehead in observance of Ash Wednesday did conflict with a job requirement, as he was allegedly required by his supervisor to remove the ashes prior to performing his work duties. Defendant contends that it has no policy against wearing ashes on Ash Wednesday. But whether there was an official policy or not, the undisputed facts cast in the light most favorably to plaintiff indicates that plaintiff was required by his employer to remove the ashes upon entering the office. Therefore, plaintiff's religious belief that he should wear ashes in observance of Ash Wednesday was in direct conflict with his job requirements.

The final element[7] of plaintiff's religious accommodation claim requires a showing that plaintiff was disciplined for failing to comply with the conflicting work requirement. Plaintiff cannot meet this burden because he complied when he was asked to remove the ashes. If this were a case in which plaintiff was asked to remove the ashes, refused, and was disciplined or discharged because of that refusal, then an accommodation claim would be appropriate. Because plaintiff wiped off the ashes as requested,

_____

[7]Defendant concedes the second element, that the employer was aware of plaintiff's religious beliefs.

it is not possible for his employment to have been terminated as a result of his refusal to do so.  See Stone v. West, 133 F.Supp.2d 972, 985 (E.D. Mich. 2001).  In Stone, the plaintiff claimed that her employer failed to accommodate her request to not work on the Sabbath.  The Court found that plaintiff's accommodation claim failed because she "almost entirely acceded to her employer's insistence that she work a schedule that conflicted in part with her Sabbath." Id.

Similarly, in Isse v. American University, 540 F.Supp.2d 9 (D.D.C. 2008), a shuttle bus driver claimed that his scheduled route conflicted with his Friday prayer services, even though the plaintiff never refused to drive a scheduled route in order to attend the prayer services.  He was later terminated and brought suit for failure to accommodate and wrongful termination.  The court granted summary judgment in favor of the employer on the accommodation claim, finding that the plaintiff's consent to the conflicting job requirements, at the expense of attending prayer service, prevented him from bringing a religious accommodation claim.  Isse, 540 F.Supp.2d at 29.  The court noted that, while plaintiff was precluded from bringing an accommodation claim, the allegations that the employer was hostile to plaintiff's religious beliefs may be relevant to the wrongful termination claim. Id.

As in Isse, plaintiff is precluded from bringing a religious accommodation claim because he does not allege that his employment was terminated because he refused to comply with company policy regarding the display of ashes.  Thus, he suffered no adverse employment action from the conflict between his work requirements

and his religious beliefs. Accordingly, summary judgment is granted in favor of defendant on plaintiff's religious accommodation claims.

**C.** <u>**Disparate Treatment**</u>

Plaintiff's final claim is that he was discriminated against and wrongfully terminated from his employment because of his religion. To proceed under a disparate treatment theory, as plaintiff is attempting to do, "proof of discriminatory intent is necessary". <u>See</u> <u>Marzec v. Marsh</u>, 990 F.2d 393, 395 (8th Cir. 1993). Plaintiff may establish discriminatory intent through either direct or circumstantial evidence. <u>See</u> <u>United States Postal Service Board of Governors v. Aikens</u>, 460 U.S. 711, 715 (1983). "Because direct evidence of discriminatory intent is rare, the Courts have developed a tripartite allocation of burdens and order of presentation of proof in Title VII cases." <u>Marzec</u>, 990 F.2d at 395. This framework is outlined in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), and first requires the plaintiff to prove a *prima facie* case of discrimination by the preponderance of the evidence. Once the plaintiff proves a *prima facie* case, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for the termination of plaintiff's employment. <u>McDonnell Douglas Corp.</u>, 411 U.S. at 802-03. If the employer is able to do so, then the plaintiff is given an opportunity "to show that [the employer's] stated reason for [the termination] was in fact pretext." <u>Id.</u> at 804. However, while the burden of production shifts throughout the <u>McDonnell</u>

<u>Douglas</u> analysis, "the ultimate burden of proving discriminatory intent rests with the plaintiff". <u>Marzec</u>, 990 F.2d at 395.

The Court begins its analysis by noting that plaintiff has not presented any direct evidence of discriminatory intent. Therefore the Court will employ the analysis outlined in <u>McDonnell Douglas</u> to determine whether plaintiff has presented sufficient circumstantial evidence of discrimination. The first issue under the <u>McDonnell Douglas</u> analysis is whether plaintiff has established a *prima facie* case of religious discrimination. "The elements of a *prima facie* case of wrongful termination based on disparate treatment are: (1) membership in a protected group; (2) qualification for a position; (3) termination; and (4) circumstances that raise an inference of wrongful discrimination." <u>Winbush v. State of Iowa by Glenwood State Hosp.</u>, 66 F.3d 1471, 1482 (8th Cir. 1995).

The first and third elements are not disputed by defendant, as there is no doubt that plaintiff is a member of a protected class and was terminated from his employment. Defendant does suggest, though, that plaintiff has failed to show that he was qualified for the position. Defendant contends that plaintiff was not performing his duties satisfactorily and was therefore no longer qualified for the position. The Court believes that plaintiff has at least created a question of material fact on the issue of whether he remained qualified for his position at the time of his termination.

The final element of the *prima facie* case requires a showing of sufficient circumstances to raise an inference that the termination was motivated by discriminatory animus. The circumstantial evidence presented by plaintiff consists of the same allegations as

discussed at length above, including: (1) plaintiff's request to not attend the topless show; (2) Mr. Dawson's angry reaction to plaintiff's request, even though plaintiff was not required to attend the show; (3) Mr. Dawson's use of profanity towards plaintiff on at least two occasions; (4) Mr. Dawson's decision not to attend the conference in Las Vegas with plaintiff; (5) Mr. Dawson's statement to plaintiff that he would tell everyone in the office that plaintiff was a "problem employee"; (6) Mr. Dawson's angry reaction when plaintiff arrived at the office with ceremonial ashes on his forehead; (7) the requirement that plaintiff remove the ashes while at work; and (8) Mr. Dawson's avoidance of plaintiff following the Ash Wednesday incident.

The Court finds that these allegations are not sufficient to raise an inference of discriminatory intent. Plaintiff has not presented any evidence showing that Mr. Dawson cared at all about plaintiff's religion. Plaintiff has not alleged that Mr. Dawson reacted negatively to plaintiff's discussion of his religion and admits that Mr. Dawson did not object to, criticize, or mock plaintiff's religious beliefs. Mr. Dawson may have disagreed with plaintiff's decision not to attend the Folies Bergere show or with plaintiff's decision to arrive at work with ashes on his forehead, but there is no evidence that Mr. Dawson was discriminating against plaintiff because of the religious beliefs which fueled those decisions.

Even if plaintiff's allegations were sufficient to establish a *prima facie* case of discrimination, the Court easily concludes that plaintiff cannot demonstrate that defendant's stated reason for

plaintiff's termination was pretextual. Defendant claims that plaintiff was terminated for his combative and uncooperative interactions with management. Defendant contends that plaintiff had his own ideas about what to incorporate into the training sessions and was often reluctant to comply with management directives regarding the subject matter of the classes.

Defendant's stated reason for plaintiff's termination is fully supported by the evidence. First, plaintiff admits that Mr. Dawson hired plaintiff while aware of plaintiff's religious views. Plaintiff was terminated just four months later, also by Mr. Dawson. "There is a strong inference that discrimination was not a motivating factor if the same person hired and fired the plaintiff within a relatively short period of time." <u>Herr v. Airborne Freight Corp.</u>, 130 F.3d 359, 362 (8th Cir. 1997).

Further, e-mail evidence demonstrates plaintiff's reluctance to comply with the training directives of management. In an e-mail from plaintiff to Mr. Dawson on January 17, 2005, plaintiff informed Mr. Dawson that the material did not relate well to his class and that he would include the items into his first training session only if he could. Mr. Dawson replied to plaintiff: "This material will be in your training class, period." Thus, even prior to his first training session, plaintiff was already displaying uncooperative and insubordinate behavior.

In a February 2, 2005 e-mail from plaintiff to Mr. Dawson, plaintiff asks Mr. Dawson if they could speak regarding the conflict that had arisen between them. Plaintiff subsequently describes the conflict as management having a different training

philosophy from plaintiff's personal training philosophy. Plaintiff told Mr. Dawson that he wanted to teach classes focusing on skill set development while the senior management wanted him to teach classes focusing on instructing employees on what to say to customers. Plaintiff then asked Mr. Dawson to approach upper management regarding plaintiff's philosophy.

A day later, plaintiff e-mailed a friend from the Las Vegas conference to say that he was going to build his own training model and, in plaintiff's own words: "if Midcoast doesn't want my talent, bye bye bye!!!!" It is obvious from these e-mails that plaintiff had his own training ideas that he desperately wanted to teach, even if doing so was not what the Midcoast management wanted.

But perhaps the most telling statement in this matter was one made by plaintiff to a friend in an e-mail shortly after plaintiff returned from the Las Vegas conference. In it, plaintiff informs his friend that "[t]he thrashings at work continue... *All because* I want to approach training as teaching and dared to ask a question." (emphasis added). Plaintiff's own statement that his work conflict was "all because" of his different philosophy regarding training supports defendant's stated reason for plaintiff's termination. All of this evidence indicates that the divide that formed between plaintiff and Mr. Dawson was caused by this conflicting training philosophy and plaintiff's uncooperative attitude towards the training desires of management.

It is significant that, while several of the e-mails reference the training conflict, there is not one mention of any purported

discriminatory act against plaintiff based on his religion. In fact, the only work conflict discussed in the e-mails is the training conflict. Because plaintiff has presented little or no evidence of discriminatory intent and plaintiff's own statements support the defendant's stated reason for plaintiff's termination, summary judgment in favor of defendant on plaintiff's disparate treatment claim is appropriate.

### IV. Conclusion

Plaintiff has failed to support his claims for hostile environment, failure to accommodate, or disparate treatment. The undisputed factual evidence, ignoring plaintiff's unsupported conclusory allegations, fails to show any discriminatory intent behind the termination of plaintiff's employment with defendant.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff's motion for leave to amend his statement of material facts [#64] is **granted**.

**IT IS FURTHER ORDERED** that defendant's motion for summary judgment [#31] is **granted**.


CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 6th day of August, 2008.